UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

CLARK CROSS,                          )
                                      )
        *Plaintiff*,                  )
                                      )        Case No. 1:09-cv-275
v.                                    )        Judge Mattice
                                      )
SBARRO AMERICA, INC.,                 )
                                      )
        *Defendant*.                  )

## MEMORANDUM AND ORDER

Before the Court are the following:

•       Defendant's Motion for Summary Judgment [Court Doc. 45], with a
        Response from Plaintiff [Court Doc. 47] and a Reply [Court Doc. 53];

•       Plaintiff's Motion to Strike [Court Doc. 48], to which Defendant has filed a
        Response [Court Doc. 58] and Plaintiff has filed a Reply [Court Doc. 63];

•       Defendant's Notice of Objection and Motion to Strike Declaration of Eric
        Norman [Court Doc. 51], which was followed by Plaintiff's Response [Court
        Doc. 57] and Defendant's Reply [Court Doc. 64]; and, finally,

•       Defendant's Notice of Objection to Plaintiff's Affidavit [Court Doc. 52], which
        was then followed by a Memorandum in Support of Defendant Sbarro
        America, Inc.'s Notice of Objection and Motion to Disregard Plaintiff's
        Affidavit [Court Doc. 54], Plaintiff's Response [Court Doc. 55], and a Reply
        [Court Doc. 65].

For the reasons explained below, the Court will take the following action:

•       Plaintiff's Motion to Strike [Court Doc. 48] will be construed as a Notice of

Objection and the objections contained therein will be **OVERRULED IN PART** and **SUSTAINED IN PART**;

- Defendant's Objection to the Declaration of Eric Norman [Court Doc. 51] will be **SUSTAINED**;

- Defendant's Objection to Plaintiff's Affidavit [Court Doc. 52] will be **OVERRULED**; and

- Defendants' Motion for Summary Judgment [Court Doc. 45] will be **DENIED**.

## I. FACTS AND PROCEDURAL HISTORY

The facts, viewed in the light most favorable to the Plaintiff, are as follows.

Defendant hired Plaintiff Clark Cross in December 2007 to be a Co-Manager of Defendant's store #191, located in Hamilton Place Mall in Chattanooga, Tennessee. (Court Doc. 1-1, Compl. ¶ 6; Court Doc. 47, Pl.'s Resp. in Opp'n to Mot. for Summ. J. at 2.) For most of Plaintiff's employment, Elizabeth Grafe ("Ms. Grafe") was the store's general manager, and Bob Shannon ("Mr. Shannon") was Ms. Grafe's superior and the Director of Operations responsible for store #191. (Pl.'s Resp. at 2.) On March 20, 2009, Doug Stevens ("Mr. Stevens") succeeded Bob Shannon as the Director of Operations for the area. (Court Doc. 45-6, Declaration of Douglas Stevens ¶ 4.) Before he became the Director of Operations, Mr. Stevens was involved in the hiring of Spencer Reeves ("Mr. Reeves") to be a co-manager with Plaintiff, and Mr. Reeves began working at the store on March 16, 2009. (Pl.'s Resp. at 3.)

According to Plaintiff, when Mr. Stevens initially visited store #191 to introduce himself and meet the staff, his first question to Plaintiff was, "how old are you and how is

your health?" (Court Docs. 45-3, 47-1, 53-1 & 55-1, 2, 3, 4, 6, 7, 8,[1] Pl.'s Dep. at 274.)

The second time that Mr. Stevens was visiting the store, Plaintiff bought some coffee and was drinking it as he clocked in and Mr. Stevens said something like, "we don't drink anything on the front line, at your age you ought to know better." (Pl.'s Dep. at 282.)

On March 25, 2009, a $500 deposit that Ms. Grafe was supposed to make the next morning went missing. (*Id.*) Plaintiff discovered a missing deposit slip the night of March 25, 2009 and called Mr. Reeves that evening to advise him of the potential problem. (*Id.*) When Mr. Reeves checked at the bank the next morning, he discovered the actual deposit was indeed missing. (Pl.'s Dep. at 326-328.) According to Mr. Stevens, Mr. Reeves reported this problem and other cash-handling issues to Mr. Stevens on March 26, 2009 and opined that Plaintiff and Ms. Grafe might be involved in floating deposits or other misconduct. (Stevens Decl. ¶¶ 19-20.) Based on this information and review of the deposit log, Mr. Stevens determined that Plaintiff was the last to handle the missing deposit and had also violated the cash handling policy in two ways by failing to fill out the information for the deposit that was missing and altering a date on the deposit slip.[2] (*Id.* ¶ 21.)

As a result of the missing deposit and problems that might be contributing to the store's poor performance, Mr. Stevens decided to seek permission from Defendant's Human Resources department to terminate both Ms. Grafe and Plaintiff for violations of

---

[1]    All of these documents contain excerpts of Plaintiff's deposition. For ease of reference, the Court will hereafter cite only to "Pl.'s Dep." for any citations to deposition, and the excerpt cited may or may not be available in each of these documents.

[2]    Nothing about altering a date appears on the warning that Plaintiff received for the violations of the cash-handling policy. (Court Doc. 45-4 at 89.)

the cash control policy.  (*Id.* ¶¶ 22-23.)  Before Mr. Stevens contacted the HR Department, however, Ms. Grafe made the deposit, and Mr. Steven's resulting investigation made it clear that Ms. Grafe, not Plaintiff, had been responsible for the missing deposit.  (*Id.* ¶¶ 24; Court Docs. 45-13 & 47-3, Stevens Dep. at 147.)   Although Mr. Stevens received permission from HR to terminate both employees based on the outcome of the investigation, he did not terminate Plaintiff at that time.  (Stevens Decl. ¶ 27.)  Mr. Stevens stated that he verbally warned Plaintiff about the violations of the cash-handling policy on April 1, 2009.  (*Id.*)  Mr. Stevens did not have to terminate Ms. Grafe for her role in the missing deposit because she ceased showing up for work after depositing the missing money and thus effectively quit.  (Pl.'s Resp. at 3.)  After Ms. Grafe quit, Mr. Reeves was promoted to General Manager of the store on April 13, 2009.  (*Id.*; Stevens Dep. at 61-62; Stevens Decl. ¶ 43.)

 On April 2, 2009, Mr. Reeves told Mr. Stevens that Plaintiff, the manager on duty to close the night before, had left the store dirty and had not permitted employees to take their assigned breaks.  (Stevens Decl. ¶ 28.)  Mr. Reeves wanted to write Plaintiff up, and Mr. Stevens gave him permission to do so.  (*Id.*)  Mr. Reeves also told Mr. Stevens that Plaintiff had failed to fill out the deposit log information the night before, and Mr. Stevens approved another written warning for Plaintiff.  (*Id.* ¶ 34.)

On some date shortly after April 2, 2009, Mr. Reeves gave Plaintiff two documents titled "Corrective Action Warning."  (Court Doc. 45-4 at 89-90.)  Both warnings are dated April 2, 2009, and both are marked "Final Warning" as opposed to the only other alternative, which was "Written Warning."  (*Id.*)  The first states, "[o]n 3/25 we had a

missing deposit, and Clark had not correctly filled out the Safe tracker and cash audit and the correct Deposit bag info. Then on 4/1/09 did not have the correct data filled out on the safe tracker."[3] (*Id.* at 89.) The second warning reads "[d]uring the close on 4/1/09 Clark left the store in a mess. Pizza table was dirty, coke machine was dirty, glass inside and out was dirty, hand sink and si [sic] sink in the kitchen had not been wiped down. No employee's [sic] had taken breaks and one employee was on the clock longer than their shift required." (*Id.* at 90.) Both warnings require the Action Plan to be implemented immediately, and state in slightly different terms that "[i]f problem not fixed will result in termination." (*Id.* at 90.)

In a letter to the Tennessee Department of Labor & Workforce Development (concerning Plaintiff's application for unemployment benefits) and his deposition, Plaintiff recounted two conversations with Mr. Reeves. During the first conversation, which appears to have been before Plaintiff received the two warnings, Plaintiff asked Mr. Reeves if he was next to go, and Mr. Reeves said that he did not know but that Mr. Stevens wanted Plaintiff out of the store. (Court Doc. 45-23, Pl.'s Letter to Gregg Hickman; Pl.'s Dep. at 267-269.) Plaintiff asked Mr. Reeves to let him know if termination was imminent so that Plaintiff could turn in his resignation and not have a "fire" on his work record, and Mr. Reeves indicated that he would. (*Id.*) The second conversation took place after Plaintiff received the two final warnings. Plaintiff testified that "[d]uring this conversation, I asked Spencer, I asked him point-blank, am I being fired. He returned that Doug wanted me out

---

[3] The "safe tracker" system, it seems, was a "new documentation" implemented by Mr. Stevens when he became the Director of Operations over the store. (Pl.'s Dep. at 160, 328-329). The system required managers to write down information about each deposit on a log so the deposits could be easily tracked. (*Id.* at 328-329.)

of the store.  And I asked Spencer, I said, Spencer, is there anybody in the pipeline to replace me.  And he said, not at this time, but Doug wants me to hire a much younger person, blank, period."  (Pl.'s Dep. at 150.)[4]  Mr. Reeves also reportedly told Plaintiff it would be a "good idea" to turn in his resignation letter.  (*Id.* at 139.)

Plaintiff tendered his notice of resignation to Mr. Reeves on April 10, 2009.  The notice reads, in part, "[b]e it noted that my resignation is being tendered under duress under the advice of Spencer Reeves, GM 191 and or Doug Stevens, DO."[5]  (Court Doc. 45-4 at 20, Resignation Letter.)  Plaintiff asked Mr. Reeves to send his resignation letter to the home office because he wanted it to reach the HR department and wanted someone to contact him.  (Pl.'s Dep. at 306-308.)

## II.    MOTIONS TO STRIKE AND NOTICES OF OBJECTION

The Court will first dispose of the Motion to Strike and Notices of Objection as they pertain to the exhibits and briefs filed in support of or in response to Defendant's Motion for Summary Judgment.

---

[4]    Plaintiff recounted this conversation several times during his deposition, including the following:

> I asked Spencer just point-blank.  I asked him – I said, Spencer, am I going to be fired.  And that's when he advised me that it would be a good idea, based on our prior conversation, to turn in my resignation.  And at that time I asked him – I said, do you have anybody in the pipeline – and that means, you know, on standby or somebody's already talked to or somebody to take my spot or – and he said no, not at that time, but that Doug had wanted him to hire a much younger manager.

> (Pl.'s Dep. at 284-285.)  This is also outlined similarly in Plaintiff's letter to Gregg Hickman, the officer who heard Plaintiff's unemployment benefits case.

[5]    It is worth noting that Plaintiff refers to Mr. Reeves as the general manager of the store, when he was not officially promoted until April 13, after Plaintiff turned in his resignation. (Stevens Decl. ¶ 43.)

### A.    Plaintiff's Motion to Strike

As a preliminary matter, the Court notes that the United States Court of Appeals for the Sixth Circuit has stated that Motions to Strike are only proper as a means to strike pleadings as outlined in Federal Rule of Civil Procedure 7(a).  *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006).  "Exhibits attached to a dispositive motion are not "pleadings" within the meaning of Fed.R.Civ.P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f)."  *Id.*   The preferred method to challenge exhibits is by filing a notice of objection.  *See Sutton v. U.S. Small Bus. Admin.*, 92 F. App'x 112, 118 (6th Cir. 2003).  Accordingly, the Court will construe Plaintiff's Motion to Strike as a notice of objection to each document.

Plaintiff's Motion objects to three documents: Defendant's Statement of Undisputed Facts [Court Doc. 40], which Defendant filed in support of its Motion for Summary Judgment [Court Doc. 45], the Tennessee Department of Labor & Workforce Development Appeals Tribunal decision [Court Doc. 41-1], and a paragraph of Bob Shannon's Declaration [Court Doc. 39-2].  (Court Doc. 48, Pl.'s Mot. to Strike at 1-2.)

As to the first document, Plaintiff states that Defendant's Statement of Undisputed Facts is not permitted under the Federal Rules of Civil Procedure or the Local Rules, and that Defendant has used the document to impermissibly extend the page limit for its Motion for Summary Judgment by incorporating the lengthy (41 page) document into its brief.  (Court Doc. 49, Mem. in Supp. of Mot. to Strike at 1-3.)  Defendant asserts that although the document is not expressly permitted by the Federal Rules of Civil Procedure or the Local Rules, it is not expressly prohibited, and this Court has previously considered such

documents.  (Court Doc. 58, Def.'s Resp. in Opp'n to Pl.'s Mot. to Strike at 2-3.)

While it is true that this Court has previously considered Statements of Undisputed Material Facts, which are not prohibited by the Rules, the Court now finds that such documents have limited value and they will not henceforth be considered in conjunction with a Motion for Summary Judgment in this case or any other.

As it pertains to this case, the Court finds that Defendant did incorporate the entire Statement of Undisputed Facts in its Motion for Summary Judgment.  Instead of including a fact section, the Factual Background section merely reads "[f]or purposes of this Motion, Sbarro incorporates by reference the Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment ("Facts"), filed simultaneously herewith." (Court Doc. 41, Mem. in Supp. of Def.'s Mot. for Summ. J at 7.)  The absence of a fact section and incorporation of a 41-page statement of facts could certainly be Defendant's attempt to circumvent the 25-page limit for its brief, although the Court will make no finding that Defendant intended to do so.  As an alternative, however, Defendant could have asked for permission to exceed the page limit pursuant to Local Rule 7.1(b) and chosen the facts relevant to include in its Motion.

Although Defendant urges the Court to accept the Statement by retroactively granting a Motion to exceed the page limit, the Court notes that many of the facts included in the Statement in the instant case are not particularly relevant for purposes of the Court's review on summary judgment.  In any event, all of the facts outlined in the Statement are found in the documents and exhibits currently in the record, which the Court fully reviewed. In addition, the Statement--like many others the Court has seen--includes many facts that are very much in dispute, which renders the representation of the document as one that

presents undisputed facts fairly useless to the Court. Moreover, many of the cases Defendant cites do approve of a concise document which outlines only the undisputed facts but, as this document is not concise and does not include only undisputed facts, its value to the Court is thus limited.

Finally, as a more general matter, the Court does not see the benefit in having citations to such a Statement in the briefs on the Motion for Summary Judgment. This results in a cumbersome process by which the Court must then follow the citation in the brief to the Statement, which then cites to the appropriate location in the record. This process can be simplified by citing to the place in the record that supports each fact included in the fact section of the brief.

Accordingly, Plaintiff's objection to Defendants' Statement of Undisputed Facts is **SUSTAINED** and the Court will not consider this document in its analysis of the Motion for Summary Judgment.

As to the Tennessee Department of Labor & Workforce Development decision on Plaintiff's unemployment benefits, Plaintiff asserts that this is an unauthenticated document that contains inadmissible hearsay. (Pl.'s Mem. at 3-4.) In addition, Plaintiff contends that, by statute, this decision cannot be conclusive in any other legal proceeding. (*Id.* at 4.) Defendant claims that Plaintiff produced the document during discovery and cannot challenge its authenticity, and Defendant further asserts that it is admissible pursuant to Federal Rule of Evidence 803(8)(C). (Def.'s Resp. at 15-18.) Defendant also represents that it does not offer the decision as conclusive, but rather as persuasive evidence. (*Id.* at 18.) In addition, Defendant attached an authenticated copy of the decision to its response. (Court Doc. 59-1.)

Although Defendant argues that this Court has previously ruled that such documents are admissible under Federal Rule of Evidence 803(8)(C), Defendant inexplicably distinguishes between the case it relied on, *Bickford v. Life Care Ctr. of Am.*, 2008 WL 5378076 (E.D. Tenn. Dec. 23, 2008), and Plaintiff's cite to *Wright v. Columbia Sussex Co.*, 2008 WL 972699 (E.D. Tenn. Apr. 7, 2008), by stating that the latter is not applicable because it only concerns a motion in limine to exclude evidence at trial. Actually, both cases concern motions in limine to exclude evidence at trial, and the December 23, 2008 *Bickford* decision does not, as Defendant represents, address this issue at the summary judgment stage.[6] The Court can locate no Tennessee state or federal case in which a court ruled on the admissibility of this type of document in conjunction with a summary judgment motion. Accordingly, the Court sees no reason to determine the admissibility of this document at this stage of the litigation. Plaintiff can file a motion in limine seeking to exclude the document at trial for reasons of irrelevance or prejudice, but the introduction of the document as an exhibit for the Court's review on the Motion for Summary Judgment is of no moment because the Court will not be confused as to the issues or give the document any undue weight. Therefore, Plaintiff's objection to this document is **OVERRULED**.

Finally, Plaintiff challenges paragraph 11 of Bob Shannon's Declaration as containing inadmissible hearsay--namely, certain statements allegedly made to him by Elizabeth Grafe. (Pl.'s Mem. at 4.) Plaintiff asserts that Defendant is offering these statements for the truth of the matter asserted, i.e. that Plaintiff was an employee with

---

[6] The summary judgment decision in *Bickford* is found at 2008 WL 5245993 (E.D. Tenn. Dec. 15, 2008), but it does not contain the analysis to which Defendant refers.

performance problems.  (*Id.*)  Defendant argues that this portion of the Declaration is admissible under Fed. R. Evid. 803(21) as to reputation, and also because it is not being offered for the truth of the statement, but rather to show Mr. Shannon's state of mind regarding Plaintiff's performance--and apparently, by extension, Mr. Steven's state of mind regarding same.  (Def.'s Resp. at 19-20.)

Defendant's argument is simply too attenuated for the Court.  While Ms. Grafe's alleged statements may speak to the state of mind of the person who was on the receiving end of the statements--Mr. Shannon--it is taking it a step further to say that these statements also prove Mr. Steven's state of mind.  Essentially, Defendant wants Ms. Grafe's statements to Mr. Shannon, relayed to Mr. Stevens, to establish what Mr. Stevens thought about Plaintiff's performance.  Defendant has filed Mr. Steven's affidavit in support of the Motion for Summary Judgment, however, and this affidavit contains statements which better establish Mr. Steven's state of mind with regard to Plaintiff's performance. (Court Doc. 45-6, Stevens Decl.)  In fact, paragraph 6 of Mr. Steven's affidavit references statements made to him by Mr. Shannon about possible management problems at the restaurant, including statements about Plaintiff's performance.  (*Id.* ¶ 6.)  If it is truly Defendant's intent to establish Sbarro's state of mind as to Plaintiff, the Court finds that Mr. Steven's affidavit will be more than sufficient for Defendant's purposes.  Accordingly, Plaintiff's objection to paragraph 11 of Mr. Shannon's affidavit is **SUSTAINED** and the Court will not consider those statements in its analysis.

## B.    Defendant's Notices of Objection

### 1.    *First Notice of Objection [Court Doc. 51]*

Defendant's first Notice of Objection concerns the Declaration of Eric Norman, which was filed as an exhibit in support of Plaintiff's Response to Defendant's Motion for Summary Judgment.  (Court Doc. 47-9, Norman Decl.)  Defendant asserts that this Declaration is inadmissible unless Mr. Norman will be present at trial for cross-examination; however, because Mr. Norman is currently imprisoned, he will be unavailable to testify at trial.  (Court Doc. 51, Mem. in Supp. of Def.'s Notice of Objs. and Mot. to Strike Decl. of Eric Norman at 3-4.)  Defendant further argues that the statements in the Declaration are inadmissible hearsay in any event.  (*Id.* at 4-5.)

Plaintiff contends that the requirement that a declarant be available for cross-examination at trial is not contained in Rule 56 governing summary judgment.  (Court Doc. 57, Resp. in Opp'n to Def.'s "Mot." to Strike Decl. of Eric Norman at 2-3.)  Plaintiff argues that the Declaration meets the standards outlined in Rule 56 and it should be considered by the Court.  (*Id.* at 3-4.)  As to Defendant's second objection regarding hearsay, Plaintiff relies on Federal Rule of Evidence 801(d)(2)(D) for the proposition that statements by Mr. Reeves qualify as admissions by a party-opponent because Mr. Reeves is an agent of Defendant, the statements were made in the scope of the agent's employment and during the employment relationship, and the statements concerned a matter in the scope of employment.  (*Id.* at 4-6.)  Because Mr. Reeves was in charge of Plaintiff's store during the relevant period, had power to hire and fire individuals, and had control over the evaluation and direction of employees, Plaintiff asserts that he was an agent of Defendant and his

statements are therefore admissible through Mr. Norman's Declaration. (*Id.* at 5-7.)

The Court declines to resolve the legal questions involved because the Court will not consider Mr. Norman's Declaration for other reasons. First of all, the Declaration is less than one page, and the statements contained therein are those of Spencer Reeves, who is not the person accused of discriminating against Plaintiff. Therefore, it has extremely limited probative value to the Court's analysis of the Motion for Summary Judgment and the Court did not and will not consider this document. Accordingly, and without making any legal finding, Defendant's Notice of Objection is **SUSTAINED**.

### 2.    *Second Notice of Objection [Court Doc. 52]*

Defendant's second Notice of Objection concerns Plaintiff's affidavit, filed in support of the Response to Defendant's Motion for Summary Judgment. (Court Doc. 47-4.) Defendant has objections to every paragraph contained in the affidavit, starting with a technical deficiency in the first paragraph where it reads Plaintiff's counsel's name rather than that of Plaintiff. (Court Doc. 52, Def.'s Notice of Objs. to Pl.'s Aff. at 1.) Because Plaintiff has filed an amended affidavit to correct that error, the Court will **OVERRULE** that portion of Defendant's Objection. (Court Doc. 56, Am. Cross Aff.)

The bulk of Defendant's objections argue that Plaintiff's affidavit is in direct conflict with his deposition testimony, such that the affidavit cannot be considered in support of Plaintiff's Response. Some of these same issues were raised in Defendant's Motion for Sanctions, which was denied by Magistrate Judge Carter. (Court Docs. 30 & 50.) To address each of Defendant's objections when the Court finds no appreciable conflict that would warrant the rejection of Plaintiff's affidavit would be a waste of the Court's resources,

particularly in a case where the sheer volume of filings is already unduly burdensome. To support its ruling, however, the Court will provide a few examples that led to its conclusion.

Defendant objects to paragraph 3 of Plaintiff's affidavit, which states as follows:

> 3.  I dispute any accusations that I made false statements or misrepresentations on my resume that I submitted to Sbarro. As I testified in my deposition, I did hold the positions of General Manager for Krystal and Burger King, even though I did not officially have the title. While working for both Krystal and Burger King, I functioned as interim General Manager after the General Manager quit. In this capacity, I was in charge of the store. Furthermore, as I testified in my deposition, I do have a Bachelor degree from Chattanooga College of Business that I earned in 1972. These are not false statements, but the truth.

(Am. Cross Aff. ¶ 3.) Defendant argues that the first sentence of this affidavit contradicts Plaintiff's deposition testimony but, in essence, Defendant argues that Plaintiff did in fact make false statements on his resume, and that two resumes Defendant obtained during discovery contain significant discrepancies which contradict Plaintiff's affidavit statement. (Def.'s Objs. at 4-5.) The Court understands Defendant's position that it was false or misleading for Plaintiff to write that he had a four-year degree when he had only attended a now defunct school at night for 12-14 weeks to obtain a Bachelor of Science in Business, but the fact remains that a BS is generally a four-year degree, and Plaintiff has a piece of paper that says he has a BS. Plaintiff did not put on the resume that he attended school for four years, which would certainly be false. In response to a direct question from Defendant about this statement being untruthful and a direct question about whether or not he had a four-year degree in business, Plaintiff clearly testified during his deposition that "[i]f I was given the degree, which I was, and I attended their school, I did exactly what they

said to do, and they said at the end of this you will have a four-year degree, I would take it that I had a four-year degree. . . . My certificate, my diploma says I do . . . . I believe in my heart that I do [have a four-year degree in business]."  (Pl.'s Dep. at 205-206.)

Likewise, while Defendant clearly does not agree with Plaintiff's exaggeration of his position titles at Krystal and Burger King, the Court does not find the resume, deposition testimony, and affidavit statements to be in conflict.  Plaintiff clearly testified that while he did not hold the title of General Manager at either restaurant, he did function as an interim General Manager after the previous managers left.  (*Id.* at 61-66, 232.)

The supposed conflict between Plaintiff's statement that he never received warnings about his performance before receiving his two final warnings, and Plaintiff's deposition testimony, is also devoid of any significant conflict.  One portion of deposition testimony to which Defendant refers reads as follows:

> Q:     . . . had you – had you not had a conversation with Doug Stevens about your performance, verbally?
>
> A:     We had a constructive talk, yes, sir.
>
> . . .
>
> Q:     You recall when you first met Mr. Stevens that he did address some aspects of your performance with you. Remember that?
>
> A:     Yes, sir.  That was in the – that happened during the time frame, and we had a sit-down our in the – the food court area.  And I tried my best to explain to him, you know, sometimes people get trained wrong, but the people that were trained wrong think they're doing it right when they're doing it wrong all – all along, but it's due to their training.  And I informed him then that – that I was told by my first general manager that after the Christmas break, after the Christmas season, our busy time or their busy time or – that – you know, that I was

to go to Knoxville and that store up there for training, which never happened, and now I got bits and pieces in my training. I was – I'll say this and be as truthful as I can. I was never trained properly in that store as far as paperwork and procedures and things of this – I dug it out myself. What I learned, I dug out myself by going through what I could find to go through.

. . .

Q:      All right. So you did know that Mr. Stevens was not happy with your performance from what he observed by the time you first met him, correct?

A.      That's what I gathered.

(Pl.'s Dep. at 270, 274-275, 278-279.) The Court does not interpret Plaintiff's description of this "constructive talk" with Mr. Stevens as a "warning" about Plaintiff's work performance or "verbal coaching" by Mr. Stevens. Furthermore, the relevant paragraph of Plaintiff's affidavit speaks more specifically to the fact that Plaintiff never received performance warnings from Mr. Shannon, not Mr. Stevens. (Am. Cross Aff. ¶ 2.) While Defendant represents that Mr. Shannon communicated with Plaintiff about performance issues, there appears to be no documentation in Plaintiff's personnel file that he was ever warned about his performance before he received the two written warnings from Mr. Reeves and Mr. Stevens. (Stevens Dep. at 87.) Clearly, Defendant believes that Mr. Shannon or Mr. Stevens stating that Plaintiff was warned about performance issues makes it so, but this does not provide the Court with a conflict between Plaintiff's deposition and Plaintiff's affidavit. Likewise, while Mr. Stevens may take a different view of the above conversation, the issue Defendant raises is the existence of a conflict between *Plaintiff's* deposition and *Plaintiff's* affidavit – not Plaintiff's deposition and Mr. Stevens' or Mr. Shannon's affidavit. The Court finds no such conflict in *Plaintiff's* statements.

Moreover, Defendant's objections to Plaintiff's statements about the two written final warnings he received are not well taken. It is clear to the Court from Plaintiff's deposition testimony that he did dispute the two final warnings, and there is no conflict with Plaintiff's affidavit.[7]

---

[7] Plaintiff testified in his deposition as follows:

> Q: Okay. So as we sit here today, do you dispute the write-ups you receive for those two – those two write-ups that –
>
> A: Sir, both of them were acknowledged by my signature.

[This is the end of the portion that Defendant cites in support of the objection. (Def.'s Objs. at 9.)]

> Q: Okay.
>
> A: *And by me saying that, I want to say this: That my signature on there only signifies that I received the write-ups, not necessarily that I agreed with them.*

(Pl.'s Dep. at 132.) (emphasis added).

Later in his deposition, Plaintiff testified more specifically about both warnings. Plaintiff did not dispute that he left the bag number off the safe tracker and that was a legitimate reason to write him up, but thought that being terminated "just for leaving out a bag number" would have been extreme. (*Id.* at 338-339.) Plaintiff disputed that he could have filled out the deposit log information for the March 25 deposit because Ms. Grafe made the actual deposit. (Am. Cross Aff. ¶ 5.) Plaintiff also disputed the second part of the first warning, which stated that he failed to fill out information on the safe tracker information on April 1. (*Id.*) Plaintiff testified that after the March 25 incident, "it never happened again" -- apparently meaning that he did not commit any more violations of the cash handling policy. (*Id.* at 340.) Plaintiff also disputed an occasion during which Mr. Reeves reportedly gave him a verbal warning for another cash handling violation which involved leaving a drawer with money in it in the cash register overnight, calling it "a figment of somebody's imagination." (*Id.* at 340; Court Docs. 45-14 & 47-5, Reeves Dep. at 87.)

Moreover, Plaintiff testified that he disputed the second warning about not closing the store properly and stated that "there was some extenuating circumstances on this, and I – Spencer gave me this one. He said, I really know that you were sick and didn't feel good and all you wanted to do was go home. But he said, I've got to – I've got to give you this. And he – and this – when I said that's fine, I said, you know, *I want you to know that I'm signing this just as a receipt of my receiving of both of them. I said, I'm not agreeing with either one of them, but I will sign them as a witness of my receipt.*" (*Id.* at 345.) (emphasis added). Plaintiff testified that he was not over the flu when he worked the shift that led to this warning, and he disputed the warning because "nine times out of ten, I'd never leave the store looking like that . . . . I got everything ready, and I went home." (*Id.* at 346.) Plaintiff agreed that it was the manager on duty's responsibility to make sure

-17-

In addition, the Court quite frankly fails to see how any of this is at issue at the summary judgment stage, such that the Court should concern itself with rejecting the affidavit. Certainly, Defendant will have the opportunity to attack Plaintiff's credibility during trial, but the Court is not tasked with making credibility determinations at this juncture. The Court instead has to determine if there are genuine issues of material fact. The resume that Plaintiff submitted to Defendant has little relevance to this task because it does not establish or prove anything about Plaintiff's work ethic or work habits that would be dispositive with regard to Defendant's theory of the case. Moreover, the factual disputes Defendant emphasizes in this objection only serve to demonstrate to the Court that there are indeed several genuine issues of material fact which remain for the jury. Accordingly, Defendant's Objection to Plaintiff's Affidavit is **OVERRULED**.

## III.    MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc*., 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or

---

the store was clean, but stated that "I personally didn't see it, what [Mr. Reeves] saw when he got there that morning." (*Id*. at 348.)

determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may bear this burden by either producing evidence that demonstrates the absence of a genuine issue of material fact, or by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case."  *Id*. at 325.  To refute such a showing, the nonmoving party may not simply rest on its pleadings.  *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *see Anderson*, 477 U.S. at 249.  The nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute.  *Celotex*, 477 U.S. at 322.  A mere scintilla of evidence is not enough.  *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party.  *Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907.  Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case.  *Anderson*, 477 U.S. at 254.  Thus, if the plaintiff must ultimately prove his case at trial by a preponderance of the evidence, the Court must, on a motion for summary judgment, determine whether a jury could reasonably find by a preponderance of the evidence that the plaintiff's factual contentions are true.  *See id.*  If the nonmoving party fails to make a sufficient showing on an essential element of its case

with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

### B. Analysis

Defendant seeks dismissal of Plaintiff's two claims. Plaintiff has asserted that he was subject to age discrimination pursuant to the Age Discrimination in Employment Act ("ADEA") and the Tennessee Human Rights Act ("THRA"). The ADEA states that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The relevant part of the THRA states that it is discriminatory practice for an employer to "[f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401(a)(1).

The Tennessee General Assembly has stated that the purpose of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964 . . . and [the ADEA] of 1967, as amended . . . ." T.C.A. § 4-21-101(a)(1). Accordingly, the same analysis applies to plaintiff's age discrimination claim under the THRA as under the ADEA. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620

(6th Cir. 2006) (applying the same analysis to an age discrimination claim brought under the THRA as an age discrimination claim brought under the ADEA); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) ("Tennessee courts have 'looked to federal case law applying the provisions of the federal anti-discrimination statues as the baseline for interpreting and applying' [the THRA]") (citation omitted).  Under both, Plaintiff must prove "by a preponderance of the evidence[] that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2351 (2009); *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 485 (6th Cir. 2010).

Defendant argues that Plaintiff cannot establish a *prima facie* case of age discrimination under either the ADEA or the THRA.  (Court Doc. 41, Mem. in Supp. of Def.'s Mot. for Summ. J. at 8-20.)  Defendant contends that the facts do not support any constructive discharge claim, such that Plaintiff cannot establish this element of his *prima facie* case.  (*Id.* at 10-20.)  This argument assumes that Plaintiff has produced circumstantial evidence that requires the application of the burden-shifting framework outlined by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), but Plaintiff claims that he has both direct and circumstantial evidence that Mr. Stevens forced Plaintiff to resign due to his age.  (Court Doc. 47, Resp. in Opp'n to Mot. for Summ. J. at 1.)

Before the Court can address Defendant's argument with regard to the *prima facie* case, the Court must address whether Plaintiff has produced direct evidence of age discrimination.  Direct evidence is "'evidence that proves the existence of a fact without

requiring any inferences.'" *Owens v. Wellmont, Inc.*, 343 F. App'x 18, 22 (6th Cir. 2009)

(quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)).

Although the Court does have before it several statements produced by Plaintiff that speak

to possible age-based animus by Mr. Stevens, the Court finds that none of the statements

taken alone are sufficient to constitute direct evidence of age discrimination; that is, each

statement alone requires an inference to reach the conclusion that it was motivated by a

discriminatory intent.

If the plaintiff cannot provide direct evidence and instead provides circumstantial

evidence, the Court applies the burden-shifting analysis initially described by the Supreme

Court in *McDonnell Douglas*.  *McClain v. NorthWest Community Corr. Ctr Judicial Corr.

Bd.*, 440 F.3d 320, 332 (6th Cir. 2006).  That analysis may be summarized as follows:

> First, the plaintiff has the burden of proving by the
> preponderance of the evidence a *prima facie* case of
> discrimination. Second, if the plaintiff succeeds in proving the
> *prima facie* case, the burden shifts to the defendant "to
> articulate some legitimate, nondiscriminatory reason for the
> employee's rejection." Third, should the defendant carry this
> burden, the plaintiff must then have an opportunity to prove by
> a preponderance of the evidence that the legitimate reasons
> offered by the defendant were not its true reasons, but were a
> pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell

Douglas*, 411 U.S. at 802).

### 1.    *Prima facie case*

Plaintiff can establish a *prima facie* case of age discrimination by establishing four

elements: "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he

was subjected to an adverse employment action; (3) he was otherwise qualified for the

position; and (4) he was replaced by a younger worker." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008); *Barnes v. GenCorp.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

There is no dispute as to three of the four elements. Plaintiff was 63 at the time he resigned, he was qualified for the position inasmuch as he had been performing it for over a year, and he was replaced by Ryan Sanders, age 20. (Pl.'s Dep. at 260; Reeves Dep. at 94; Court Docs. 45-26 & 47-7, Blake Dep. at 142.) Defendant strenuously disputes the fourth element, whether Plaintiff was subjected to an adverse employment action, by arguing that Plaintiff's theory of constructive discharge is not supported by case law. The Court is cognizant, however, that Plaintiff's burden at the *prima facie* stage is extremely light; indeed, as the Supreme Court stated in *Burdine*, the *prima facie* burden is "not onerous" and "'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Burdine*, 450 U.S. at 253-54; *see also Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 735 (6th Cir. 2004) (describing the burden as "minimal.").

The Sixth Circuit has stated that "[t]he law in this circuit is clear that a constructive discharge exists if working conditions are such that a reasonable person in the plaintiff's shoes would feel compelled to resign." *Bruhwiler v. Univ. of Tennessee*, 859 F.2d 419, 421 (6th Cir. 1988). "A constructive discharge claim 'depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee.'" *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008) (citation omitted). In a typical constructive

discharge case, a plaintiff must provide evidence to show that "1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (citation and internal quotations omitted).

Plaintiff, however, urges the Court to follow the analysis outlined in *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121 (6th Cir. 1998), in which the Sixth Circuit approved application of a "no definite prospect of continued employment with the company" version of constructive discharge. *Id.* at 1128. The *Scott* court stated:

> [W]here ordinary charges of constructive discharge typically entail a decision on the part of the employee to resign in light of an intolerable working environment or some such allegation, [the plaintiff] decided upon the option best suited to his needs with the understanding that he did not have the option of continued employment. For that reason, we find that the doctrine of constructive discharge applies in this case.

*Id.* The Sixth Circuit further outlined this constructive discharge claim in *Ford v. Gen. Motors Corp.*, 305 F.3d 545 (6th Cir. 2002) and *Harris v. Butler Cnty., Ohio*, 344 F. App'x 195 (6th Cir. 2009), stating that "[w]e have found . . . that an employee's resignation may constitute a constructive discharge when the employee reasonably believes his termination to be imminent." *Harris*, 344 F. App'x at 199 (citing *Ford*).

Plaintiff in the instant case resigned his employment voluntarily and, like the plaintiff in *Scott*, he is not the typical discrimination plaintiff who is fired, let go or not hired. This atypicality, however, does not mean that Plaintiff's theory of constructive discharge is so beyond the pale as to be fatal to his *prima facie* case. The Court finds the *Scott, Ford,* and *Harris* approach useful in the instant case and, viewing the facts in the light most favorable

to Plaintiff, the Court finds factual support in the record for the proposition that Plaintiff felt he had no definite prospect of continued employment with Defendant. The Court further finds support in the record for the premise that the impact of Defendant's actions was foreseeable. For the reasons stated below, the Court concludes that Plaintiff has established the adverse employment action element of his *prima facie* case.

The totality of the circumstances surrounding Plaintiff's resignation are telling. Here we have a Plaintiff who had never before received any performance warnings during over a year of employment with Defendant and received two final written warnings on the same day, a mere couple of weeks after a new Director of Operations takes over. One of these warnings includes violations of a policy that had apparently just been implemented by the new Director, Mr. Stevens, and both indicate that a failure to improve will result in termination. Plaintiff disputes the validity of both warnings.[8]

Plaintiff's interactions (or lack thereof) with Mr. Stevens are equally instructive. Mr. Stevens makes comments about Plaintiff's age on the few times they have occasion to interact. Mr. Stevens is involved in the hiring of a co-manager who would conceivably be on par with Plaintiff or inferior to him, having not worked with Defendant before -- but instead, the younger co-manager essentially becomes Plaintiff's superior after only approximately two weeks of work, is essentially in charge of running the restaurant (indeed,

---

[8] Defendant repeatedly states in its brief that Plaintiff admitted that he deserved these warnings. (Def.'s Mem. at 3, 13, 21.) As the Court analyzed above with respect to Defendant's Notice of Objection to Plaintiff's affidavit, Plaintiff did dispute the validity of the warnings. The Court will not credit Defendant's assertion that Plaintiff believed he deserved the warnings. At most, Plaintiff admitted that the warnings *could* be given for violations of those policies, but disputed the warnings as to the circumstances present when *he* received them for the supposed violations, or disputed the severity of a final warning being given for a particular violation.

he was promoted to general manager after less than a month of employment with Defendant), and is essentially the only conduit of information between Mr. Stevens and the store. Mr. Stevens rarely dealt directly with Plaintiff, even after the store had no general manager; instead, he communicated almost exclusively with Mr. Reeves. (Stevens Dep. at 53.)

Plaintiff testified during his deposition that he was concerned for his job even before he received the two warnings based on the changes that had occurred since Mr. Stevens' arrival (i.e. the hiring of Mr. Reeves and departure of Ms. Grafe):

> Q:     Okay. So you were afraid that you were going to lose your job even before you got written up?
>
> A:     Yes, sir.
>
> . . .
>
> Q:     What was – before you got written up, why did you think you were going to lose your job?
>
> A:     Just reading the pages of the book, how things were going.
>
> Q:     And what do you mean by that?
>
> A:     Just being in the business for a while, you know, people make changes, you know, and that – I've – you know, I've seen it happen to others before, and it was happening to me.
>
> Q:     What was happening that –
>
> A:     People want their people.
>
> Q:     Okay. So you thought Doug Stevens, because he was coming in, might want his own people?
>
> A:     Quote/end quote, yes, sir.

. . .

A:     I knew, you know, a lot of things – a lot of changes were going to be made, and I just wanted to know if I was going to be one of the changes, you know, that I was losing my job.

(Pl's. Dep. at 269-270.)

These rapid and escalating changes to Plaintiff's work environment prompted Plaintiff to discuss his job security with Mr. Reeves on two occasions, and what he learned from Mr. Reeves convinced him that the only choice was to resign or be fired.[9] As the

---

[9] Defendant objects to the admissibility of statements made by Mr. Reeves on hearsay grounds because Mr. Reeves was allegedly reporting statements by Mr. Stevens that are being offered for the truth of the matter asserted–i.e., that Mr. Stevens wanted Plaintiff out of the store and wanted Mr. Reeves to hire a younger manager. Plaintiff asserts that Mr. Reeves' statements are admissible pursuant to Fed. R. Evid. 801(d)(2)(D), which provides that certain admissions of a party-opponent are not hearsay. Specifically, the statement must be "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." (Pl.'s Resp. at 14.) Plaintiff claims that Mr. Reeves was an agent of Defendant because he was essentially acting as the general manager of store #191 after Ms. Grafe quit and, as the acting general manager, Mr. Reeves had the authority to hire and fire staff members, was involved in personnel issues involving Plaintiff, and wrote the two final warnings and delivered them to Plaintiff. (*Id.*; Reeves Dep. at 34, 71-76.) Plaintiff further asserts that the statements concern a matter within the scope of Mr. Reeves' employment and occurred during his employment with Defendant. (*Id.* at 15-16.)

Defendant argues that Mr. Reeves' statements are not admissible under this provision because Mr. Reeves could not make the decision to fire Plaintiff and was therefore not an agent of Defendant. (Court Doc. 73-1, Def.'s Am. Reply at 20.) Defendant further claims that Mr. Reeves' statements were merely expressing opinions about Mr. Stevens' intentions. (*Id.* at 20-21.)

The Court finds that these statements are admissible pursuant to Fed. R. Evid. 801(d)(2)(D). Although Plaintiff's representations of the conversation contain double hearsay (i.e. as to both Mr. Reeves' statements to Plaintiff and as to Mr. Stevens' statements to Mr. Reeves), Rule 801(d)(2)(D) allows for the admission of both statements as non-hearsay admissions by a party-opponent. As to the question of agency, the Court finds that Mr. Reeves was the de facto general manager of store #191, such that he could act as an agent of Defendant with respect to Plaintiff's employment. Plaintiff testified repeatedly during his deposition about Mr. Reeves' status at this time. Plaintiff stated that Mr. Reeves was the "quote/end quote, general manager. He was over everyone in the store," that although he was listed as co-manager, "he was doing all the duties of a general manager, and the operations director, Doug Stevens, always went through him. So it was plain and evident that Spencer was the general manager," that Mr. Reeves was "a general manager without title," and that as a consequence, Plaintiff had almost no

Court has already noted above, during the first conversation, Plaintiff asked Mr. Reeves

if he was next to go, and Mr. Reeves said that he did not know but that Mr. Stevens wanted

Plaintiff out of the store.  (Pl.'s Letter; Pl.'s Dep. at 267-269.)  Plaintiff asked Mr. Reeves

to let him know if termination was imminent so that Plaintiff could turn in his resignation and

---

contact with Mr. Stevens, who primarily operated through Mr. Reeves.  Plaintiff testified, "I asked [Mr. Stevens] for his phone number one time in case I needed to call him if Spencer wasn't there, and he said, Spencer has it.  It was to me like he didn't want any contact with me or what."  (Pl.'s Dep. at 135-136, 287, 305; Stevens Dep. at 53.) Although Mr. Reeves could not fire Plaintiff without Mr. Stevens' approval, he and Mr. Stevens were having conversations about the prospect of Plaintiff's continued employment, Mr. Reeves was reporting information about Plaintiff's supposed shortcomings to Mr. Stevens, Mr. Stevens was directing Mr. Reeves to take action with regard to Plaintiff, and it is apparent that Mr. Reeves would have had some influence or input as to Plaintiff's employment because he was acting as general manager and by virtue of the close contact he had with Mr. Stevens about Plaintiff.  (Reeves Dep. at 75-76; Stevens Dep. at 100.)  Furthermore, Plaintiff testified that he did not have the understanding that Mr. Reeves did not have the authority to fire him, given the state of affairs.  (Pl.'s Dep. at 135-136.)  Indeed, if Plaintiff did not believe that Mr. Reeves was getting information from Mr. Stevens about his continued employment, Plaintiff would not have asked Mr. Reeves to let him know if termination was imminent.  (*Id.* at 267-268.) The Court finds that Mr. Stevens and Mr. Reeves were both agents of Defendant for the purpose of communicating information about Plaintiff's employment.

Mr. Stevens' alleged statements to Mr. Reeves were certainly within the scope of his employment, as he was a direct decision-maker with regard to Plaintiff.  As to the question of whether Mr. Reeves' report of Mr. Stevens' statements to Plaintiff was within the scope of *his* employment, the Court finds the analysis in the recent case of *Wilson v. Budco*, ___ F. Supp.2d ___, 2011 WL 43423 (E.D. Mich. Jan. 6, 2011) and the case of *Carter v. Univ. of Toledo*, 349 F.3d 269 (6th Cir. 2003) instructive.  The *Wilson* court, citing *Carter*, stated that "[w]hether something is within an employee's scope of employment extends beyond matters involving direct decisionmakers."  *Wilson*, 2011 WL 43423, at *8.  The court further stated that "although comments made by individuals not involved in the decision-making process cannot constitute direct evidence of discrimination," these statements can provide circumstantial evidence of discrimination. *Id.*  The *Carter* court elaborated that the inquiry under Rule 801(d)(2)(D) "goes beyond simply determining if the declarant is a direct decision-maker" because "the statements of managerial-level employees who have the ability to influence a personnel decision are relevant" and "the 'scope of employment' criterion extends beyond direct decision-makers."  *Carter*, 349 F.3d at 275 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir. 2003)).  As the acting general manager of the store, Mr. Reeves had authority to hire and fire employees and had to consult with Mr. Stevens to fire other managerial employees, but it is evident that Mr. Reeves had the ability to influence personnel decisions that would ultimately be made by Mr. Stevens.  Indeed, as that pertained to Plaintiff, Mr. Stevens had conversations with Mr. Reeves regarding Plaintiff's written warnings and his shaky employment status.  Accordingly, the Court finds that Plaintiff's continued employment was a matter within the scope of Mr. Reeves' employment.

not have a "fire" on his work record, and Mr. Reeves indicated that he would.  (*Id.*)

Plaintiff testified that after he received the two warnings, he thought his days were numbered because "the way that they were worded . . . I could have cut a tomato wrong and been fired."  (Pl.'s Dep. at 283-284.)  Plaintiff further stated that he knew his job was in jeopardy "[f]rom the way that [Mr. Reeves] acted that morning . . . I thought, yeah, you know, he – he knows something I don't know, and I'm out the door."  (*Id.* at 284.)  Plaintiff therefore had another talk with Mr. Reeves about the status of his job.  During this conversation, Plaintiff testified that "I asked Spencer, I asked him point-blank, am I being fired.  He returned that Doug wanted me out of the store.  And I asked Spencer, I said, Spencer, is there anybody in the pipeline to replace me.  And he said, not at this time, but Doug wants me to hire a much younger person, blank, period."  (Pl.'s Dep. at 150.)  At this point, Mr. Reeves reportedly told Plaintiff that it would be a "good idea" to turn in his resignation.  (Pl.'s Dep. at 139.)

Plaintiff testified that based on the few interactions he had with Mr. Stevens, he felt that it would be useless to approach him directly to ask about his job security.[10]  (Pl.'s Dep.

---

[10]    Plaintiff testified as follows:

> Q:    You never went and talked to Mr. Stevens to find out if he actually, in fact, wanted you terminated, did you?
>
> A:    At that point in time, Doug Stevens and I had very, very very little contact. Everything – like I said, I was the oldest manager in the store, but everything was coming through Spencer.  Spencer was the acting or whatever, he was the lead manager in that store at that time. . . . I've never been talked to about the reason why Spencer was over me or what.  But it was plain and evident that Spencer was – was the, quote/end quote, acting general manager, lead manager, top dog, whatever you want to call it, at that store at that time.
>           . . .
>
> A:    I felt like if I was to go to Doug Stevens, I would have been like the old saying – in the wind.
>
> Q:    Pissing in the wind?
>
> A:    Yes, sir.
>           . . .

at 312-314.)  Plaintiff thereafter turned in his resignation letter, which states "[b]e it noted that my resignation is being tendered under duress under the advice of Spencer Reeves, GM 191 and or Doug Stevens, DO."  (Resignation Letter.)  It is abundantly clear to the Court that "under duress" in this context means that Plaintiff felt that he had no choice but to resign after conferring with Mr. Reeves, who was essentially Plaintiff's direct pipeline to Mr. Stevens, and who was giving him information that certainly made it sound like termination was imminent.  The Court finds Mr. Stevens' interpretation of the term -- that Plaintiff was "under stress because he knew he was not adequately performing his job duties and was not meeting my performance expectations" -- to be rather strained.  (Stevens Decl. ¶ 37.)

Defendant argues that Mr. Stevens never had any intention of firing Plaintiff after giving him the warnings, provided that his performance improved.  (*Id.* ¶¶ 41-42.)  What Mr. Stevens actually thought or intended, however, is irrelevant to this part of the inquiry.  The Court must consider whether a reasonable person in Plaintiff's shoes would have felt that termination was imminent.  The Court concludes that a reasonable person, in the circumstances in which Plaintiff found himself, would have felt that his or her job was in serious jeopardy and the only option besides being fired would be to resign.

As to the question of whether the employer could have foreseen the impact of the conduct on Plaintiff, the Court finds Mr. Stevens' actions with regard to Plaintiff illustrative.

---

A:      I felt it would be totally useless.
        . . .
A:      After some of the statements that he made and I got to thinking about them, I knew it would have been useless, totally useless.

(Pl.'s Dep. at 312-314.)

Mr. Steven's e-mail to HR seeking permission to fire both Ms. Grafe and Plaintiff after finding out about the missing deposit reads that "[t]here is also a Co-Manager in that store that has had numerous violations for cash control policy by not filling out deposit log to not writing anything on deposit tickets to not taking deposits to the bank." (Court Doc. 45-29, Stevens E-mail.) This is a strong statement given that there is no documentation of written warnings to Plaintiff in over a year of employment with Defendant. In addition, Mr. Stevens' deposition testimony was rather confusing with respect to where he got this information -- he stated that it came from Mr. Shannon, but then stated that he believed that he and Mr. Shannon talked more specifically after he sent the e-mail and that Mr. Shannon described in detail the cash control issues at the store during that conversation. (Stevens Dep. at 89-91.) Where Mr. Stevens got such detailed information about Plaintiff's alleged infractions at the time of the e-mail, therefore, is somewhat mysterious.[11] Indeed, if Mr. Shannon had so many problems with Plaintiff, it is a wonder to the Court why Plaintiff never received any written warnings prior to Mr. Stevens' tenure. Morever, the e-mail was sent on April 1,

---

[11]     During Mr. Stevens' deposition, he testified as follows:

>       Q:      Were you aware when you wrote this e-mail that [Plaintiff] had ever
>               received any written write-ups, warnings, or anything of that nature?
>       A:      Just what I received from Bob Shannon, which was verbal.
>       Q:      Okay. So at the time you wrote this e-mail, you weren't aware of any
>               written write-ups?
>       A:      Nothing that I have seen.
>       Q:      Before you wrote this e-mail, was there any documentation that [Plaintiff]
>               had been counseled at all, even verbally counseled, for alleged cash-
>               control policy violations?
>       A:      No.
>       Q:      So other than Bob Shannon orally telling you that information, there's no
>               document that you're aware of that memorializes those verbal
>               counselings?
>       A:      That I'm aware of, no.

(Stevens Dep. at 87.)

2009, which was after the missing deposit at issue showed up at the bank.  Mr. Stevens testified that his investigation as to who was responsible didn't conclude until April 1 and that the e-mail was sent before the conclusion of that investigation, but he found out shortly after this e-mail that Ms. Grafe was the responsible party.  (Stevens Dep. at 93-96, 147.)

In the e-mail, Mr. Stevens continues, "I have a good guy in there know [sic] who is Spencer Reeves who just got done training at my old home store in Cary N.C.  I would like permission to get rid of the Co-Manager and G.M. ASAP."[12]  (*Id.*)  Ms. Rubendall followed up with a phone call, during which she told Mr. Stevens that "it was [his] discretion, at [his] discretion, on whether to get rid of both of them, one of them, *depending on the investigation outcome*."  (Stevens Dep. at 88.)  Once the investigation was complete, however, it became apparent that Ms. Grafe was responsible, not Plaintiff.  Mr. Stevens stated that HR told him that could still terminate Plaintiff "for his serious policy violations given his clear violations of the Company's cash handling policies *combined with his unusual conduct and history of poor performance*."[13]  (Stevens Decl. ¶ 25.)  Plaintiff was not fired.  Instead, Mr. Stevens gave Plaintiff a verbal warning on April 1 and he testified that after this e-mail, he participated in a conference call with HR and the group "decided that -- let's give [Plaintiff] another chance, but most likely he's probably going to end up shooting himself in the foot."  (Stevens Dep. at 104.)  The very next day, Mr. Stevens

---

[12]  Mr. Stevens testified that his e-mail meant that he "wanted permission to, depending on this investigation of where this deposit was at, to get rid of either [Plaintiff] or [Ms. Grafe] or both."  (Stevens Dep. at 84.)

[13]  Again, it is somewhat unclear to the Court where Mr. Stevens procured information about Plaintiff's history of poor performance, given that there is no record of written or verbal discipline or warnings in Plaintiff's file and Mr. Stevens' testimony about getting the information from Mr. Shannon is confusing.

approved the two final warnings for Plaintiff.  Around the time that Plaintiff received the warnings, Mr. Stevens had a conversation with Mr. Reeves about Plaintiff, during which they discussed how they were "trying to give [Plaintiff] a chance here to correct things and to make things right, and he's shooting himself in his own foot."  (*Id.* at 100.)  Mr. Stevens also told Mr. Reeves that "[Plaintiff's] got to get things turned around and do the right thing or we're going to have to get somebody else in here."  (*Id.*)  As the Court has already noted, Mr. Stevens had almost no direct contact with Plaintiff during this time, choosing instead to operate through Mr. Reeves in most of his communication with Plaintiff.

From these facts, it appears to the Court that Mr. Stevens' attitude towards Plaintiff was poor from the beginning of his tenure as Director of Operations and that his attitude was apparent to multiple people, including Plaintiff.[14]  The conversations Mr. Stevens and Mr. Reeves had about Plaintiff's job security are particularly telling because the information could easily have been (and reportedly was) transmitted to Plaintiff.  Indeed, Plaintiff's two conversations with Mr. Reeves make it clear that Plaintiff was cognizant that Mr. Stevens was communicating with Mr. Reeves about his employment.  The Court also notes that, although Mr. Stevens stated that he intended to give Plaintiff a chance to improve after the verbal warning on April 1, giving Plaintiff two final written warnings the next day does not evince that intent.  In addition, because Mr. Reeves was still technically a co-manager,

---

[14]    As Plaintiff testified:

> A:    I had very little – I have very little conversation with Doug Stevens.  He – matter of fact, he – I asked him for his phone number one time in case I needed to call him if Spencer wasn't there, and he said, Spencer has it. It was to me like he didn't want any contact with me or what.

(Pl.'s Dep. at 287.)

Plaintiff certainly had to know that Mr. Stevens played a significant role in approving the two written warnings. The Court concludes that it was foreseeable from Mr. Stevens' actions that a reasonable person would have felt that termination was imminent.

The Court has reviewed all of the circumstances leading up to Plaintiff's resignation and viewed the facts in a light most favorable to Plaintiff. The Court is cognizant of Plaintiff's low burden at the *prima facie* stage, and the Court concludes that Plaintiff has produced enough evidence to establish that he suffered an adverse employment action. A reasonable jury could infer from these circumstances that Plaintiff was constructively discharged from his employment with Defendant because he had no definite prospect of continued employment. Accordingly, Plaintiff has established all of the required elements of his *prima facie* case.

### 2. *Legitimate, Nondiscriminatory Reason*

Because Plaintiff has established his *prima facie* case, the burden now shifts to Defendant to provide a legitimate, nondiscriminatory reason for its actions. Defendant represents that any actions taken by Mr. Stevens were motivated by Plaintiff's "serious performance deficiencies" and the crisis at Defendant's store rather than age discrimination. (Def.'s Mem. at 21.) Defendant represents that it could have fired Plaintiff after one cash handling policy violation and it instead gave Plaintiff another chance to improve; when Plaintiff did not improve, Defendant was within its rights to give Plaintiff two final warnings indicating that failure to improve would result in termination. (Stevens Decl. ¶¶ 25-34.)

### 3. *Pretext*

Because Defendant has articulated a legitimate, non-discriminatory reason for its

actions, the burden now shifts back to Plaintiff to produce evidence from which a jury could conclude that the reason given by Defendant is a pretext for discrimination.  Plaintiff may meet this burden by offering evidence sufficient to establish that Defendant's proffered reason (1) had no basis in fact, (2) did not actually motivate Defendant's conduct, or (3) was insufficient to warrant Defendant's conduct.  *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 576 (6th Cir. 2006); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Plaintiff offers the following statements to support the proposition that Defendant's stated legitimate reason was merely pretext for age discrimination.  First, Plaintiff alleges that Mr. Stevens made two age-based comments directly to him.  The first time they met, Mr. Stevens reportedly asked Plaintiff, "how old are you and how is your health?" and on another occasion, Mr. Stevens scolded Plaintiff for drinking coffee on the front line and said, "at your age you ought to know better."  (Pl.'s Dep. at 274, 282.)  Plaintiff also relies on the statement of Mr. Reeves during the second conversation about Plaintiff's job security, in which Mr. Reeves allegedly stated that Mr. Stevens "wanted him to hire a much younger manager."  (*Id.* at 150, 284-285.)

Ryan Sanders, who replaced Plaintiff as co-manager, also reported potentially age-based statements by Mr. Stevens.  On one occasion, Mr. Sanders was in the cooler when Mr. Stevens was at a desk outside the cooler and he heard Mr. Stevens say something like, "this is why we don't hire older people."  (Court Docs. 45-18 & 47-8, Sanders Dep. at 44.)  Mr. Sanders testified that he believed that Mr. Reeves was standing there with Mr. Stevens and one other person was also present.  (*Id.* at 45.)  Mr. Sanders was not sure of the context of the statement and testified that it sounded like Mr. Stevens may have said

it jokingly, but also stated that he thought the comment had something to do with hiring. (*Id.* at 46.)  Mr. Sanders testified that he heard another comment that was something like, "we need to hire younger people" approximately a month after Mr. Sanders had started work, and the comment had something to do with applications. (*Id.* at 49.)   On what appears to be another occasion, Mr. Sanders stated that he believed he heard Mr. Stevens make a comment that was along the lines of "let's not hire older people."  (*Id.* at 64, 79.)

Lee Blake also testified to a particular statement Mr. Stevens made.  Mr. Blake testified that he and Joe Ybarra were working at the store one day when Mr. Stevens came by and made a statement that was along the lines of, "what this place needs is some fresh faces to liven the place up, or we need some younger faces to liven this place up."  (Blake Dep. at 81.)  Mr. Blake later stated that it could have been "we need some young people here to liven up the place.  Or it could have been, we need some young people here to freshen up the place or we need some fresh faces here to liven up the place."  (*Id.* at 105.)  Mr. Blake testified that he does have an old head injury and is on pain medication for another injury, which can affect his ability to recall events accurately.  (*Id.* at 11-13.)  As a result, Mr. Blake could not say for sure if the comment was about fresh faces or younger faces.  (*Id.* at 82.)  Mr. Blake did testify, however, that the comment "made me standing there as a middle-aged man and Joe standing there as a middle-age man, it made both of us uncomfortable."  (*Id.*)  Mr. Blake stated that he and Mr. Ybarra talked about the comment later and they both felt the comment was biased towards them.  (*Id.* at 135.)  Mr. Blake's personal opinion was that the comment was discriminatory because "it was almost like letting you know, hey, by the way, we need some fresh people in here, you old guys.

That was kind of the feeling that we had." (*Id.* at 106, 136.) To Mr. Blake, "whether he said fresh faces or young faces doesn't matter. It was a – to me, it was a direct reference that if you don't . . . get it going, you're going to be out of here. We'll get some young people in here that can. That's the way I took it." (*Id.* at 137.)

Mr. Stevens and Mr. Reeves deny making any of the above statements, which produces a genuine issue of material fact that can only be resolved by a jury's determination of witness credibility. Moreover, the Court considered these statements in conjunction with Plaintiff's allegation that the two final warnings he received were not legitimate. The Court concludes that Plaintiff has provided the Court with enough evidence of pretext such that a reasonable jury could determine that Plaintiff would not have been constructively discharged but for his age. Essentially, and accepting as true the facts as portrayed by Plaintiff, the Court finds that a jury could conclude that Defendant's actions in giving Plaintiff two final warnings were motivated by age-based animus rather than valid performance reasons. Accordingly, the Court cannot grant Defendant summary judgment as a matter of law.[15]

---

[15] The Court notes Defendant's argument that the *Faragher/Ellerth* affirmative defense applies to this case, but the Court rejects that argument. (Def.'s Mem. at 21-22.) The Court finds that the defense outlined in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) is best suited and applied to hostile work environment claims, particularly when the claims involve a history of sexual harassment. There is no hostile work environment claim in the instant case and no evidence of ongoing harassment. Moreover, even if there were any such evidence, the defense does not apply when there is a "tangible employment action" by the employer, and constructive discharge is considered a "tangible employment action." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 140-41 (2004) (stating that "an employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge."); *see also Shannon v. Advance Stores Co.*, No. 3:08-0940, 2009 WL 2767039, at *11 (M.D. Tenn. Aug. 27, 2009) (citing *Suders* for the proposition that "when a supervisor's conduct results in an employee's constructive discharge, the employer may not rely on the [*Faragher/Ellerth*] affirmative defense.").

## IV. CONCLUSION

For the reasons explained above, the Court **ORDERS** as follows:

- Plaintiff's Motion to Strike [Court Doc. 48] is construed as a Notice of Objection and the objections contained therein are **OVERRULED IN PART** and **SUSTAINED IN PART**;

- Defendant's Objection to the Declaration of Eric Norman [Court Doc. 51] is **SUSTAINED**;

- Defendant's Objection to Plaintiff's Affidavit [Court Doc. 52] is **OVERRULED**; and

- Defendants' Motion for Summary Judgment [Court Doc. 45] is **DENIED**.

**SO ORDERED** this 15th day of February, 2011.

_/s/Harry S. Mattice, Jr._
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE